## Cleveland, Cincinnati, Chicago & St. Louis Railway Company v. C. J. Ricker.

1. INSTRUCTION—*held properly to define wantonness.* An instruction as follows : " Wantonness or wilfulness is such gross want of care and regard for the rights of others as show a disregard of consequences or a willingness to inflict an injury,"—held properly to define wantonness or wilfulness.

2. INSTRUCTION—*when, cannot be complained of.* An instruction cannot be complained of when the objecting party has asked and had given an instruction of the same import.

3. GROSS NEGLIGENCE—*what evidence may establish, as a matter of fact.* Held in this case that there was evidence tending to prove gross negligence, where it appeared that the engineer in charge of the train which ran upon and injured an infant was guilty of a disobedience of orders.

4. VERDICT—*when, not excessive.* A verdict for $1,819 is not excessive where it appears that an infant of the age of twenty-two months

was injured and suffered the loss of both legs, one above and the other below the knee.

Puterbaugh, J., dissenting.

Action on the case for personal injuries. Appeal from the Circuit Court of McLean County; the Hon. Colostin D. Myers, Judge, presiding. Heard in this court at the May term, 1904. Affirmed. Opinion filed October 14, 1904.

Rowell & Lindley, for appellant.

Jesse Hoffman, E. E. Donnelly and Wood & Elmer, for appellee.

Mr. Justice Gest delivered the opinion of the court.

On the 15th day of August, 1901, a train of appellant was run over Willie Ricker, then a baby twenty-two months old, and thereby both of his legs were cut off, one above and the other below the knee. C. J. Ricker, the plaintiff, is his father and lived at the time of the accident in Urbana, in Champaign county, on West Church street, which runs east and west. Mathews avenue runs north and south and is the first street east of plaintiff's residence. The lots facing on Church street are each sixty-six feet in width. Plaintiff lived on the second lot west of Mathews avenue. Mathews avenue is forty feet wide. The railroad track runs east and west, and it appears that the track is either in Church street or that the space occupied by the railroad is called Church street. The distance from the fence on the south end of plaintiff's lot to the railroad track is thirty feet. The freight train which caused the injury consisted of engine and tender and six box cars loaded with merchandise and mixed freight, and was moving west on a slightly rising grade with the engine pushing at the east end of the train. The crew consisted of conductor Bowles, engineer Chadwick, fireman Lewis and switchman Heath. The engineer and fireman were on the engine, the conductor and switchman were on the car at the west end of the train. Conductor Bowles had charge of the train and its crew. While the train was running west Heath and Bowles were standing together at the west end of the west car, were facing west

and were on the lookout. Heath saw a child on the track and immediately gave the emergency signal on the right-hand side of car and called Bowles' attention to the child, and he also immediately gave the same signal on left-hand side of car. As might be expected the witnesses do not agree in their statements as to the distance between the child and the west end of the train at the time the emergency signal was given, nor as to the rate at which the train was moving. The child stood on the track eighty or ninety feet west of Mathews avenue and nearer the north rail than the south, and did not change its position. The engineer says he saw Heath, the switchman, give the signal and then saw the signal given by Bowles, the conductor, and saw Bowles running. At this time the west end of the west car was distant at least two hundred and fifty feet from the child. By the testimony of some of the witnesses it was considerably farther distant. The engineer says the train was then going at possibly ten to twelve miles per hour; the fireman says nothing about the rate of speed. Other witnesses say five or six miles per hour. Bowles says four or five miles per hour at Mathews avenue and that it had then slackened up a good deal. Conductor Bowles immediately on giving the emergency signal went to the brake and set it, then set the brake on the second car and then went to the third car and then felt the train slacken up gradually. The train went westward six and a half car lengths after the child was struck before it stopped, and when it stopped the child was under the engine next to the back driver; that is, the train ran at least four hundred and sixty-five feet after the emergency signals were given before it stopped. The engine upon this train was in perfect equipment, provided with sand box and standard Westinghouse air-brakes which applied to the eight driving wheels of the engine and the eight tank wheels, and then was carrying 140 pounds of steam. The air was not connected with the cars. The signal given by Heath and Bowles was what is known as the emergency signal and means to stop instantly. Four witnesses for plaintiff, two of whom were then locomotive en-

gincers and two of whom had been such, testified as experts that such a train as the one in question, thus equipped, upon such a road and running at a speed from five to six or five to eight miles per hour could be stopped in fifty to fifty-five feet at the outside. No proof on that subject was offered by defendant. The engineer testifies that he was on the north side of his cab looking ahead at the conductor for signals; that he first saw Heath signal and then Bowles, the conductor, and that when he got the signal he applied the brake in emergency, and opened the sand lever almost instantly, and reversed the engine as soon as he saw Bowles running. He and the fireman, Lewis, say that there was nothing more he could have done to stop the train. There was no perceptible jarring of the train when the brakes were applied.

The declaration avers that the child was upon the track and that though seen and known by the servants of the defendant in charge and control of the train to be in a position of imminent peril, they wilfully, recklessly and wantonly ran and drove the train upon and over the child.

At the conclusion of plaintiff's evidence in chief and again at the conclusion of all the evidence, the defendant moved the court to direct the jury to find for the defendant and the court overruled the motion. The jury found for the plaintiff in the sum of $1,819, and the court entered judgment on the verdict.

Counsel for both sides in their arguments assume that the child was upon the right of way of defendant and was in law a trespasser, and we make the same assumption.

The declaration charges wilful and wanton injury. Defendant urges that plaintiff has wholly failed to prove that allegation and that therefore the court erred in refusing to instruct the jury to find for the defendant. Almost the entire argument of counsel is directed to that question. Substantially it is the only question presented. What is wilful or wanton negligence? We shall not enter upon a lengthy discussion of the question of negligence. It has been the subject of discussion in text books and decisions

of courts of last resort for many years, until it would seem that language was exhausted. The doctrine has been stated in all imaginable forms of expression. More definitions are not of much service in the solution of the question because they are so various in form and so general in statement; the definitions themselves at times appearing to require definition. We shall not undertake to review the books. It is sufficient for this court to take the determination of the Supreme Court of this state in like case.

The appellant in its first instruction asked and given uses the following language: "Wantonness or wilfulness is such gross want of care and regard for the rights of others as show a disregard of consequences or a willingness to inflict an injury."

In their argument counsel for appellant say: "Wilful and wanton misconduct is, strictly speaking, not negligence at all; but gross negligence, while not wilfulness, may be evidence of wilfulness;" and divers authorities are cited and quoted to support that proposition; yet in the instruction above quoted it is stated, not that wantonness may be evidenced by such gross want of care as shows a disregard of consequences, but that it is such want of care; which shows merely that it is exceedingly difficult to speak or write with absolute accuracy.

This instruction was given at the instance of appellant, and we may properly take it as a correct statement of the law in this case so far as the rights of the defendant are concerned. Was there evidence before the jury from which they could reasonably conclude that there was such gross want of care in running the train as evinces a disregard of consequences? We have stated the substance of the evidence. When the engineer saw the emergency signal the west end of the train was at least two hundred and fifty feet from the child. That signal meant that an emergency existed; that for the preservation of life or limb, or for some other most cogent reason, the train should be stopped instantly; that is the interpretation of the signal given to the engineer; all know that a train going five to

six, or eight to ten, miles per hour cannot be stopped instantly. The signal means that every possible effort should be made to stop. The train ran four hundred sixty-five feet after the engineer received the signal before it stopped. The four engineers, experts in running trains, who testified for plaintiff, say that such a train going from five to six or eight miles per hour upon such a track could have been stopped in fifty to fifty-five feet, and some of them say in less distance. The defendant offered no evidence on that point. The evidence shows that the train began to slacken on Mathews avenue, and slackened gradually and without perceptible jarring. The engineer and fireman testify that nothing more could have been done to stop the train. The credibility of witnesses and the weight to be given to their testimony is peculiarly a subject of determination by the jury. Notwithstanding the statements of the engineer and fireman that nothing more could have been done than was done to stop the train, there remain the facts and circumstances shown by the evidence; the fact that the train slowed up gradually; that there was no jar in the slowing up; that the train ran such a great distance after the signal was received by the engineer. If the testimony of the witnesses for the plaintiff, the engineers, is worthy of belief, it would seem to be more probable that the train was brought to a stand by the action of the brakes set by the conductor than by anything done by the engineer.

It is urged that the engineer did not know that the child was upon the track. It was the duty of the engineer to obey the orders that he received. By the order that he received, the emergency signal, he was told to stop the train immediately. The evidence justifies the belief that he disobeyed the order, notwithstanding his statement and the statement of the fireman to the contrary. It was not for him to determine how great the emergency was; it was not for him to wait and learn that a child was on the track in imminent danger before he obeyed orders. His duty was to obey orders. Conductor Bowles and switchman Heath were on the head car "on the look-out" and for the

purpose of signaling the engineer. Of what use they could be, it is difficult to understand, if the engineer must be first informed what the actual danger is before he is required to obey. The pilot on a ship signals the engineer in the hold; it is not for such engineer to inquire the reason for the order but it is his duty to obey. Granted, that the engineer on this train did not see the child, his superior, his pilot, did, and gave him an order to stop. The jury doubtless found that he disobeyed the order, and that such disobedience was gross negligence "showing a disregard of consequences," and we cannot say that they were not warranted in so finding.

Appellant complains of instructions given for plaintiff which define wilfulness and wantonness in the following language: "You are instructed that wilful or wanton conduct, whereby one may be injured, does not necessarily mean ill-will or malice towards the person injured, but it may consist in such lack of care for the safety of the person injured, known to be in imminent peril, as implies an utter disregard of consequences or a willingness to inflict injury upon such person."

"You are instructed that the words wilful and wanton as used in this case, do not necessarily imply malice or ill-will, but may mean such gross or wilful negligence as to indicate a total disregard of consequences and indifference to the safety of others." These instructions for plaintiff are nearly the same as the one first above mentioned asked by and given for appellant, the only difference being that they are more favorable to appellant than the one asked by it. One party cannot complain of an instruction given for the other party when he asks and gets an instruction of the same import.

It is also urged that the verdict is excessive; that "no evidence was offered upon the question of the probable earnings over his care and education, of this child, uninjured, to his father." No such evidence would have been received if offered. The damages found by the jury were not excessive. The measure of damages in this case was

not the difference between the value of the child's services up to his majority and the cost and care of providing for him. If the child had been killed the question suggested would arise.

Upon the main question in this case, the question of wantonness or wilfulness, I. C. R. R. v. Leiner, 202 Ill., p. 624, seems to be in point. In that case an instruction upon the question of wantonness or wilfulness was asked and given for the railroad company in substantially the same form as in this case.

We find no substantial error of the trial court in its rulings, instructions, given or refused, or judgment.

The judgment will be affirmed.

*Affirmed.*

Mr. Justice PUTERBAUGH dissenting.